

# COURT OF APPEALS
### SECOND DISTRICT OF TEXAS
### FORT WORTH

### NO. 02-18-00073-CV

IN THE INTEREST OF K.M., A
CHILD

----------

FROM THE 211TH DISTRICT COURT OF DENTON COUNTY
TRIAL COURT NO. 16-02573-211

----------

## MEMORANDUM OPINION[1]

----------

Appellants N.K.M. (Mother) and K.H. (Father) appeal the trial court's

judgment terminating their parental rights to their son K.M. (Kevin).[2]  In four

issues, Mother contends that the evidence is legally and factually insufficient to

---

[1]*See* Tex. R. App. P. 47.4.

[2]To protect the anonymity of children associated with this appeal, we use pseudonyms to refer to them and to other individuals.  *See* Tex. Fam. Code Ann. § 109.002(d) (West Supp. 2017); Tex. R. App. P. 9.8(b)(2)

support statutory grounds for termination. Father's appointed appellate counsel has filed a brief under *Anders v. California*, 386 U.S. 738, 744–45, 87 S. Ct. 1396, 1400 (1967), asserting that Father's appeal is frivolous. Because we overrule Mother's dispositive issues and because after carefully reviewing the record, we agree with Father's counsel that Father's appeal is frivolous, we affirm the trial court's termination judgment.

## Background

Mother met Father in 2013, and they began a romantic relationship. After they had known each other for a short time, they conceived Kevin and moved into an apartment together. Mother gave birth to Kevin in August 2014. Father told Mother that he had been in trouble for engaging in domestic violence, but that disclosure "didn't . . . bug [her]"; she "didn't see any[thing] wrong" with allowing Father to remain in the apartment and to care for Kevin.

In 2015, Father met J.W. (Jenna) on the Internet. Jenna and her son N.W. (Nick), whom she gave birth to in July 2014, moved from Florida to Texas to live in the apartment. Jenna agreed to babysit Kevin; she also believed that she and Father had started a romantic relationship. According to Jenna, Mother and Father never asked her whether she had a criminal history and never investigated her background.

By March 2016, Mother, Father, Kevin, Jenna, Nick, and Mother's brother B.M. (Brandon) lived together in the one-bedroom, one-bathroom apartment.[3] Kevin and Nick were less than two years old at that time. Mother, Father, Kevin, Nick, and Jenna usually slept together on the floor of the living room, which had no furniture, while Brandon slept in the bedroom. Kevin and Nick commonly stayed awake at night and slept during the day.

One early morning that month, after a night when all of the apartment's occupants had slept there, Father and Jenna took Nick to a hospital after he had suffered a seizure. Upon arriving there, Nick was diagnosed with severe brain injuries; he was in critical condition, and his injuries were life-threatening. He required an emergency decompressive craniotomy: doctors removed part of his skull and evacuated some of the blood surrounding his brain to allow his brain to swell outside the skull without receiving further damage.

Emergency room personnel asked Dr. Kristen Reeder, a child abuse pediatrician, to examine Nick. Dr. Reeder noticed that he had bruising, swelling, scratches, and scabs on several parts of his face. A CT scan revealed that he had a fracture to one of his ribs that had been healing for at least ten days. He also had retinal hemorrhages.

Along with physically examining Nick, Dr. Reeder spoke to Jenna and to Father. Jenna told Dr. Reeder that before Nick had his seizure, she was giving

---

[3]At some point after Jenna moved in, she moved out because, according to her, Father had pushed her. Months later, she returned.

3

him a bath at about 4 a.m., she stepped out of the bathroom to get him a towel, and a shower curtain and rod fell on him. Jenna said that shortly after she took Nick out of the bath, dried him off, and put on his pajamas, he began having the seizure. She told Dr. Reeder that she called Father, who was not at the apartment at that time, and he arrived there and attempted to give Nick water before they took him to the hospital.

Dr. Reeder concluded that Jenna's story was inconsistent with the severity of Nick's injuries; she found that the injuries were caused by a "significant violent traumatic event" and not by normal play or an accident, including a fallen shower rod. Although Dr. Reeder was unsure of the precise way that the injuries occurred,[4] she concluded that there was a "violent force that caused tearing of the blood vessels around the right side of [Nick's] brain to cause [his] brain injury and [to] cause other forces on the brain tissue."

Kimberly Mayfield, a detective with the Dallas Police Department, also spoke with Jenna and Father. They both told her that Nick's injuries had occurred while he was taking a bath. Father told Detective Mayfield that he, Mother, Kevin, and Brandon were not at the apartment when Nick sustained his injuries. Father claimed that while he was on his way back to the apartment that

---

[4]Dr. Reeder testified that Nick's injuries were not caused through blunt force, and she theorized that someone shaking him or shaking him and slamming him onto a soft surface could have caused his brain damage. Although Dr. Reeder did not see hand-print-based bruising on Nick, she testified, "Typically . . . where babies are shaken, we do not see any external bruising."

morning from "checking out a property in Mesquite," Jenna had called him to tell him about the injuries. But when Father showed his phone to Detective Mayfield, the call log did not show a call from Jenna. To Detective Mayfield, Jenna seemed to have a "strange demeanor"; she was talking slowly and methodically, and she had difficulty maintaining the conversation. Later, Jenna told Detective Mayfield that she had "obviously" lied during their first interview, and she conceded that Father and Mother were at the apartment when Nick was injured. Detective Mayfield's investigation did not reveal who had hurt Nick or the manner in which his brain injury had occurred.

Nick remained hospitalized for almost a month. He spent close to three weeks in an intensive care unit. He wore a cervical collar to keep his head straight, breathed through a tube that extended from his mouth to his lungs, and received nutrition through a feeding tube. The damage to his brain caused his inability to regulate his temperature, and he was diagnosed with hypothermia. His brain injuries resulted in life-long effects of limited use of the left side of his body and an inability to care for himself.

On the day that Nick arrived at the hospital, Mother called her long-time friend, E.T. (Emily). Mother told Emily that the police or CPS might call her and asked her to tell those authorities that Mother was at Emily's house at the time Nick was injured. In accordance with Mother's request, Emily initially told CPS that Mother had been with her that morning. Mother likewise told CPS that she

5

had stayed overnight at Emily's house. Emily later told the police the truth: Mother had not been with her.

CPS's investigation into Nick's injuries revealed that Father had previously abused a five-year-old child in New York. While Nick was still in the hospital, CPS told Mother that to maintain custody of Kevin, she needed to live away from Father. Mother signed a document stating that she would live with Emily, but she never did so and continued to live with Father.

In April 2016, the Department of Family and Protective Services (the Department) removed Kevin from Mother and Father's home. Because Mother and Father could not provide the Department the name of a relative with whom Kevin could reside, the Department placed him in foster care. Soon thereafter, the Department filed a petition in which it sought termination of Mother's and Father's parental rights to Kevin if their reunification with him could not be achieved. Around the same time, the police began a criminal investigation into the circumstances relating to Nick's injuries.

To its termination petition, the Department attached an affidavit describing Nick's injuries and hospitalization, reciting Jenna's claim that the injuries were caused by a fallen shower rod and Mother's initial claim that she and Kevin had been with Emily on the night that Nick's injuries had occurred, disclosing that Emily later admitted that Mother and Kevin had not been with her that night, and expressing that Mother eventually confessed to being home that night but claimed that she did not know how the injuries occurred. The trial court signed

6

an order designating the Department as Kevin's temporary sole managing conservator.

The Department filed a service plan. The service plan required Mother and Father to, among other tasks, participate in a psychological evaluation, complete individual counseling and parenting classes, submit to drug screenings, maintain employment and stable housing, and attend visits with Kevin. Throughout the trial court's proceedings, the Department provided the court with updates indicating that Mother had completed the requirements of her service plan and that Father had completed most of the requirements but had failed to complete a batterer's intervention course in a timely fashion.[5] Father's failure to complete the batterer's intervention classes in a timely manner concerned the Department because he had a history of engaging in domestic violence. Although Father later testified that the batterer's intervention course had taught him to be accountable for his actions, he repeatedly refused to answer questions about Nick's injuries.

During the proceedings, the trial court received evidence that Kevin was bonding with his foster family and that his foster family was meeting his needs. The court also learned that Mother and Father continued to reside together, that

---

[5]For most of the case, Mother satisfied all of the requirements of her service plan, but her eventual incarceration resulted in her inability to maintain employment and stable housing; she also conceded at trial that she had not paid for Kevin's child support or medical care. Father completed the batterer's intervention course toward the end of the proceedings in the trial court.

they continued to have a romantic relationship, that they conceived another child, and that Mother gave birth to that child, B.M. (Braxton), in February 2017.[6] Near that time, the Department considered returning Kevin to Mother and Father's care until the Department learned that the State planned on seeking indictments against Mother and Father for injuring Nick. Because of the potential for indictments against Mother and Father and because of how the resolution of those criminal charges could affect the Department's decision on whether to proceed with a termination trial, the Department requested an extension to the statutory dismissal deadline, and the trial court granted the extension.[7]

When Mother and Father were not confined, they visited with Kevin consistently. Most of the visits occurred in a room at the CPS office, but some occurred at a park or at McDonald's. Upon Braxton's birth, Mother and Father brought him to the visits. According to Mother, Kevin was "very happy" during

---

[6]The trial court allowed Mother to have unsupervised contact with Braxton after his birth and allowed Father to have contact with Braxton with Mother's supervision. Mother admitted at trial, however, that she did not always supervise Father's contact with Braxton.

Father has three children other than Kevin and Braxton. When asked about those children at trial, Father could not recall how old they were or the last names of their three mothers. He remembered that the first name of one of the mothers is Paula, and he testified that he was arrested in New York for committing domestic violence against her. He admitted that he had never formally paid child support for those children.

[7]*See* Tex. Fam. Code Ann. § 263.401(a)–(b) (West Supp. 2017).

8

the visits but became sad when the visits ended because Mother and Father "left with [Braxton] but not him."

Regarding the visits, Robert Dominguez, CPS's caseworker for Mother and Father's case at the time of trial, testified,

> The ones that I observed, there was not a whole lot of interaction between [Kevin] and [Father] or [Mother]. And when [Braxton] was brought into the visits as well, . . . he would sit on the floor and lay on his back and [Kevin] would sort of play around him or they would just watch Paw Patrol or Power Rangers.

Jacqueline Fox, a caseworker on Mother and Father's case before Dominguez became the caseworker, testified that when she observed Mother and Father's visits with Kevin, Mother "sat back and really did not engage with [Kevin]."

Darlene Kovich, Kevin's court-appointed special advocate and his guardian ad litem, observed most of Mother and Father's visits with Kevin. Regarding Father's interaction with Kevin during the visits, Kovich testified, "[Father] [brought] blankets and spread[] them out on the floor, and [Kevin] [was] not allowed to leave the blanket. They stay[ed] on the blanket for . . . four hours. [Kevin ate] pancakes and he watche[d] Power Rangers on . . . the phone." Concerning Mother's interaction with Kevin, Kovich explained that Mother "[sat] there and observe[d] [Father] with [Kevin] after she [fed] him and clean[ed] his hands. And sometimes she'[d] like rub his head, but mostly very little interaction."

According to Father, during visits, he would typically place a blanket on the floor for Kevin to sit on because the room that CPS provided was dirty. Father

9

testified that he would feed Kevin, watch cartoons with him, read to him, and play with him. He explained that he showed Kevin affection by kissing him and hugging him and that he attempted to teach Kevin manners.

Amy Watson, who observed over thirty of Mother and Father's visits with Kevin, testified that Father interacted appropriately with Kevin. Watson explained that Father used appropriate discipline and correction with Kevin, that Father played with Kevin in a loving way, that Mother was "[v]ery nurturing" with Kevin, that Father and Mother groomed and fed Kevin during the visits, and that Mother and Father appropriately adjusted their interactions with Kevin as he became older. Watson testified that Kevin was always happy to see Mother and Father. Kovich, however, testified that Mother and Father interacted differently with Kevin when Watson attended the visits; she testified that when Watson did not attend, the parents would play with Kevin "at the most [for] half an hour of each four-hour or three-hour visit."

In May 2017, Father made a statement to Dominguez that Dominguez perceived as a threat of physical violence. Father made the statement because he believed that Dominguez was not adequately investigating Mother and Father's claims that Kevin had been abused in foster care. Later, according to Dominguez, when he attempted to pick up Kevin from a visit at McDonald's and arranged for a police presence there to provide security, Father became angry and "held [Kevin] in a tight two-armed fashion." According to Dominguez, Father held Kevin that way for ten to fifteen minutes before placing Kevin in his car seat

and allowing Dominguez to take him back to his foster home. From those events, Dominguez concluded that Father has a problem managing his anger.

Regarding the McDonald's incident, Father testified that when he saw police cars outside, he became anxious because he suspected that the police were there to arrest him. He testified that he had "no idea if [he] was going to be able to see [Kevin] or [Braxton] again," so he grabbed Kevin and held him "just like any other time that [he] would hold [his] son." Father explained that he then thanked the police for coming and told Kevin that he loved him before taking him to the car. Father denied that he had ever threatened Dominguez and testified that he had never engaged in a hostile conversation with him.

Toni Tucker, who supervised Mother and Father's visits with Kevin, testified that during Father's McDonald's incident with Dominguez, Father began pacing, became agitated, spoke loudly, referred to the Department's case against him as "bogus," and took Kevin from her arms without asking. Tucker testified that Father commonly confronted Dominguez and Kovich on days that he visited Kevin and that the confrontations occurred in front of Kevin.

One day in September 2017, Mother and Father were arrested. A grand jury indicted them, along with Jenna, for crimes related to Nick's injuries. The Department took custody of Braxton. The Department's goal changed from reunifying Kevin with Mother and Father to terminating their parental rights to him, allowing his adoption, and arranging for his continued relationship with Braxton.

Kevin was three years old at the time of the jury trial on the Department's termination petition.[8]   During Mother's testimony, she invoked the Fifth Amendment to questions that concerned the events leading to Nick's injuries and her responses to the injuries.[9]   Jenna likewise invoked the Fifth Amendment when responding to such questions, including inquiries of whether Father had taken Nick into a bathroom and had shaken him, whether she had seen anyone squeeze Nick with enough force to break one of his ribs, whether a curtain rod had fallen on Nick, and why she would not tell the jury what had happened to Nick.  Father also pleaded the Fifth Amendment to all such questions.

After the parties presented their evidence and arguments to the jury, the jury found that clear and convincing evidence showed that (1) Mother and Father had knowingly placed or had knowingly allowed Kevin to remain in conditions or surroundings that had endangered his physical or emotional well-being, (2) Mother and Father had engaged in conduct or had knowingly placed Kevin with persons who had engaged in conduct that endangered his physical or emotional well-being, (3) Mother and Father had failed to comply with provisions of a court order that established the actions necessary for them to obtain Kevin's

_____

[8]The trial began on October 2, 2017.  The jury received brief testimony from one witness, and the trial court recessed the case until January 2018. Between those dates, Mother remained incarcerated; Father bonded out.  Kevin remained in foster care, and Braxton joined him in the foster home.

[9]Mother also pleaded the Fifth Amendment to other questions, including questions about whether Father was ever romantically involved with Jenna.

return after he had been removed from their care for abuse or neglect and after he had been in the managing conservatorship of the Department for at least nine months, and (4) termination of Mother's and Father's parental rights to Kevin was in his best interest.[10] The trial court signed a judgment that incorporated the jury's findings and that terminated Mother's and Father's parental rights to Kevin. Mother and Father each appealed.

**Mother's Appeal: The Evidence is Sufficient to Support Termination**

In four issues, Mother contends that the evidence is insufficient to uphold the findings supporting termination. In a termination case, the State seeks not just to limit parental rights but to erase them permanently—to divest the parent and child of all legal rights, privileges, duties, and powers normally existing between them, except the child's right to inherit. Tex. Fam. Code Ann. § 161.206(b) (West Supp. 2017); *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985). Consequently, "[w]hen the State seeks to sever permanently the relationship between a parent and a child, it must first observe fundamentally fair procedures." *In re E.R.,* 385 S.W.3d 552, 554 (Tex. 2012) (citing *Santosky v. Kramer*, 455 U.S. 745, 747–48, 102 S. Ct. 1388, 1391–92 (1982)). We strictly scrutinize termination proceedings in the parent's favor. *In re E.N.C.*, 384 S.W.3d 796, 802 (Tex. 2012); *E.R.,* 385 S.W.3d at 554–55; *Holick*, 685 S.W.2d at 20–21.

---

[10] *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E), (O), (2) (West Supp. 2017).

13

Termination decisions must be supported by clear and convincing evidence. *See* Tex. Fam. Code Ann. §§ 161.001(b), .206(a); *E.N.C.*, 384 S.W.3d at 802. Due process demands this heightened standard because "[a] parental rights termination proceeding encumbers a value 'far more precious than any property right.'" *E.R.*, 385 S.W.3d at 555 (quoting *Santosky*, 455 U.S. at 758–59, 102 S. Ct. at 1397); *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002); *see also E.N.C.*, 384 S.W.3d at 802. Evidence is clear and convincing if it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007 (West 2014); *E.N.C.*, 384 S.W.3d at 802.

For a trial court to terminate a parent-child relationship, the Department must establish by clear and convincing evidence that a parent's actions satisfy one ground listed in family code section 161.001(b)(1) and that under section 161.001(b)(2), termination is in the best interest of the child. Tex. Fam. Code Ann. § 161.001(b); *E.N.C.*, 384 S.W.3d at 803; *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005). In evaluating the evidence for legal sufficiency in parental termination cases, we determine whether the evidence is such that a factfinder could reasonably form a firm belief or conviction that the Department proved the challenged ground for termination. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). We review all the evidence in the light most favorable to the finding and judgment. *Id.* We resolve any disputed facts in favor of the finding if a reasonable factfinder could have done so. *Id.* We disregard all evidence that a

14

reasonable factfinder could have disbelieved. *Id.* We consider undisputed evidence even if it is contrary to the finding. *Id.* That is, we consider evidence favorable to termination if a reasonable factfinder could, and we disregard contrary evidence unless a reasonable factfinder could not. *See id.*

We are required to perform "an exacting review of the entire record" in determining whether the evidence is factually sufficient to support the termination of a parent-child relationship. *In re A.B.*, 437 S.W.3d 498, 500 (Tex. 2014). In reviewing the evidence for factual sufficiency, we give due deference to the factfinder's findings and do not supplant the verdict with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). We determine whether, on the entire record, a factfinder could reasonably form a firm belief or conviction of the challenged grounds for termination. Tex. Fam. Code Ann. § 161.001(b); *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002). If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction in the truth of its finding, then the evidence is factually insufficient. *H.R.M.*, 209 S.W.3d at 108.

**Endangerment under section 161.001(b)(1)(D)**

In her first issue, Mother contends that the evidence is legally and factually insufficient to support termination under section 161.001(b)(1)(D) of the family code. Section 161.001(b)(1)(D) authorizes the termination of parental rights when a parent knowingly placed or knowingly allowed a child to remain in

15

conditions or surroundings that endangered the child's physical or emotional well-being. Tex. Fam. Code Ann. § 161.001(b)(1)(D). To endanger means to expose to loss or injury or to jeopardize. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987); *In re M.E.-M.N.*, 342 S.W.3d 254, 261 (Tex. App.—Fort Worth 2011, pet. denied); *see also In re J.V.*, No. 02-15-00036-CV, 2015 WL 4148500, at *3 (Tex. App.—Fort Worth July 9, 2015, no pet.) (mem. op.) ("A child is endangered when the environment creates a potential for danger that the parent is aware of but disregards.").

Endangerment under subsection (b)(1)(D) arises from the child's environment, but a parent's conduct can contribute to an endangering environment. *In re J.T.G.,* 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.). "[A]busive or violent conduct by a parent or other resident of a child's home may produce an environment that endangers the physical or emotional well-being of a child." *Id.*; *see J.V.*, 2015 WL 4148500, at *3 ("Inappropriate, abusive, or unlawful conduct by persons who live in the child's home or with whom the child is compelled to associate on a regular basis in his home is a part of the 'conditions or surroundings' of the child's home under section 161.001(b)(1)(D)."). To prove endangerment, it is not necessary that a parent's conduct be directed at the child or that the child actually suffers injury. *J.T.G.*, 121 S.W.3d at 125. A parent's decision to continue living with someone who has committed instances of domestic violence may support an endangerment finding under subsection (b)(1)(D). *See In re M.V.*, 343 S.W.3d 543, 547 (Tex. App.—

16

Dallas 2011, no pet.). We may consider a parent's endangering conduct toward other children to determine whether the parent engaged in behavior that endangered the child at issue. *See In re S.H.*, No. 02-17-00188-CV, 2017 WL 4542859, at *11 (Tex. App.—Fort Worth Oct. 12, 2017, no pet.) (mem. op.).

Applying the standards articulated above, we conclude that legally and factually sufficient evidence supports the jury's finding under section 161.001(b)(1)(D) that Mother endangered Kevin. Tex. Fam. Code Ann. § 161.001(b)(1)(D). Nick's lifelong, severe brain injuries precipitated Kevin's removal from Mother's care. Dr. Reeder—the only medical expert presented by the parties at trial—opined that the injuries were inflicted, not accidental. Further, Nick had other injuries that he had incurred while living in Mother's home and that Dr. Reeder characterized as inflicted rather than accidental, including a broken rib and several cuts and bruises. Although the evidence did not establish who caused these injuries or the mannerism by which they were caused, the jury could have rationally decided that Mother bore some responsibility for the injuries given that (1) she knew that Father had a history of committing domestic violence and assault and that history "didn't . . . bother her" nor cause her to take precautions to protect Nick or Kevin from him; (2) she participated in a cover-up by lying about her whereabouts at the time of the injuries, which the jury could have considered as either reflecting her consciousness of guilt for abusing Nick or as her desire to protect the abuser; (3) she invoked the Fifth Amendment to questions concerning the injuries, and under a provision in the jury charge, the

17

jury was "free to draw negative inferences" from that invocation, and (4) Brandon testified that Mother knew more than she had said concerning the cause of the injuries. *See In re A.H.*, No. 02-17-00222-CV, 2017 WL 5180785, at *4 (Tex. App.—Fort Worth Nov. 9, 2017, pet. denied) (mem. op.) (explaining that in a civil proceeding, a factfinder may draw negative inferences from a party's assertion of the privilege against compelled self-incrimination, and concluding that "parents' repeated invocations of the Fifth Amendment privilege against self-incrimination . . . resulted in evidence against them"); *Anderson v. State*, No. 02-15-00405-CR, 2016 WL 1605330, at *3 (Tex. App.—Fort Worth Apr. 21, 2016, no pet.) (mem. op., not designated for publication) (explaining that an individual's false statements to police may indicate a consciousness of guilt).[11]

The jury could have reasonably determined that Mother lived with Father after becoming aware of his proclivity toward violence. In 2015, after Kevin's birth and while Father was living with Mother, he pleaded guilty to assaulting a woman. Brandon testified that Father did not treat Mother well and opined that Father is "dangerous" and has "oppressed" Mother, although he acknowledged that he had never witnessed Father physically abusing Mother. Although Mother testified that she had never seen Father use physical violence and emphasized that Father had never abused her, she admitted that she knew of his history of

---

[11]We also note that when Mother was asked whether she had endangered Kevin's physical or emotional well-being or had allowed him to remain in conditions or surroundings that endangered his physical or emotional well-being, she invoked the Fifth Amendment.

18

committing domestic violence[12] and that he had threatened to assault Brandon along with one of her former roommates. Mother also conceded that as a result of one of Father's criminal cases, a court had required him to complete anger management classes. Under these circumstances, the jury could have rationally determined that Mother had endangered Kevin by allowing him to reside with Father. Furthermore, to the extent that the jury could have determined that Jenna was responsible for Nick's injuries, the jury could have found that Mother had endangered him and Kevin by allowing Jenna to move in without investigating her background or asking about her criminal history.

Finally, the evidence shows that after Nick's injuries occurred but before Kevin's removal, Mother signed a safety plan in which she agreed to live apart from Father, but she continued to live with him, thereby failing to remove Kevin from a dangerous environment. *Cf. In re I.G.*, 383 S.W.3d 763, 770 (Tex. App.—Amarillo 2012, no pet.) ("[A] parent's failure to remove himself and his children from a violent relationship endangers the physical or emotional well-being of the children.").

We conclude that these facts could have rationally enabled the jury to form a firm belief or conviction that Mother had knowingly placed or had knowingly allowed Kevin to remain in conditions or surroundings that had

---

[12]Mother testified that after Father told her about his history of engaging in domestic violence, she "didn't go that far into the questions" to determine how many times he had done so. At trial, Father admitted that he has been arrested four times for committing domestic violence.

19

endangered his physical or emotional well-being; thus, we conclude that the evidence is legally and factually sufficient to support termination under section 161.001(b)(1)(D).[13]  *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D); *J.P.B.*, 180 S.W.3d at 573; *C.H.*, 89 S.W.3d at 28.  We overrule Mother's first issue.[14]

**Best interest under section 161.001(b)(2)**

In her fourth issue, Mother contends that the evidence is factually insufficient to show that termination of her parental rights to Kevin is in his best interest.  There is a strong presumption that keeping a child with a parent is in the child's best interest.  *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006).  We review the entire record to determine the child's best interest.  *In re E.C.R.*, 402 S.W.3d 239, 250 (Tex. 2013).  The same evidence may be probative of both the subsection (b)(1) ground and best interest.  *Id.* at 249; *C.H.*, 89 S.W.3d at 28. Nonexclusive factors that the trier of fact in a termination case may also use in

---

[13]Mother contends that in reviewing the sufficiency of the evidence to prove endangerment under section 161.001(b)(1)(D), we must consider only evidence relating to her actions prior to Kevin's removal.  The facts discussed above relate to Mother's actions and her failures to act before Kevin's removal. Further, Mother argues that her lack of wealth cannot contribute to an endangerment finding under subsection (b)(1)(D), but we do not rely on Mother's economic status in reaching our holding that the evidence is sufficient to prove endangerment.

[14]Because we uphold the jury's finding under section 161.001(b)(1)(D) and because only one finding under section 161.001(b)(1) is necessary to support termination, we decline to address Mother's second and third issues, in which she challenges findings under subsections (b)(1)(E) and (b)(1)(O).  *See* Tex. R. App. P. 47.1; *In re E.P.C.*, 381 S.W.3d 670, 684 n.3 (Tex. App.—Fort Worth 2012, no pet.).

20

determining the best interest of the child include the desires of the child, the emotional and physical needs of the child now and in the future, the emotional and physical danger to the child now and in the future, the parental abilities of the individuals seeking custody, the programs available to assist these individuals to promote the best interest of the child, the plans for the child by these individuals or by the agency seeking custody, the stability of the home or proposed placement, the acts or omissions of the parent that may indicate that the existing parent-child relationship is not a proper one, and any excuse for the acts or omissions of the parent. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976) (citations omitted); *see E.C.R.*, 402 S.W.3d at 249 (stating that in reviewing a best interest finding, "we consider, among other evidence, the *Holley* factors"); *E.N.C.*, 384 S.W.3d at 807.

We hold that the evidence is factually sufficient to show that termination of Mother's parental rights to Kevin was in his best interest. The jury could have reasonably found that the evidence discussed above that supports the endangerment finding under subsection (b)(1)(D) also reflects that Kevin would be endangered if he were returned to Mother's care,[15] that Mother did not have the ability or the desire to parent him in a manner that protected him from harm, that her acts or failures to act indicated an improper parent-child relationship, and

---

[15]Mother was confined at the time of trial, but she testified that if she were released, she would consider living with Father again, and she described herself and Father as being in "this situation" together. Mother testified that she spoke to Father through phone calls from jail as much as possible.

21

that over the course of the litigation in the trial court, she had failed to provide an excuse for her acts or omissions. *See Holley*, 544 S.W.2d at 371–72.

Furthermore, at the time of trial, Mother had a pending criminal charge and an immigration hold; she immigrated from the Congo, and her immigration hold prevented her from obtaining release through a bond. Thus, the jury could have reasonably determined that if it returned Kevin to her legal custody, she would be unable to take physical possession of him, to take advantage of programs aimed at helping her promote his best interest, to provide a stable home, or to meet his physical needs. *See id.*; *see also In re Z.D.C.P.*, No. 04-17-00090-CV, 2017 WL 2457054, at *3 (Tex. App.—San Antonio June 7, 2017, no pet.) (mem. op.) (considering a parent's uncertain immigration status as a factor affecting a child's best interest); *In re A.M.*, No. 11-13-00239-CV, 2014 WL 358982, at *3 (Tex. App.—Eastland Jan. 30, 2014, no pet.) (mem. op.) (considering a parent's indictment in a best-interest review).

Next, given Kevin's young age, he did not testify about his desires, but the jury received evidence from multiple witnesses who observed Mother's visits with Kevin indicating that Mother did not show a bond with him. Dominguez testified that during the visits, there was "not a whole lot of interaction" between Kevin and Mother. Fox testified that at the visits, Mother did not engage with Kevin. Kovich testified that there was "very little interaction" between Mother and Kevin and that she and Father played with Kevin sparingly during the visits. Tucker testified that when Father and Mother visited Kevin at a playground, he played while Mother

22

and Father watched. When Tucker was asked whether she sensed that Mother was concerned about Kevin and Braxton, she testified, "I can't say. She never really said anything."

Mother completed most of the requirements of her service plan, and a hypothetical factfinder could have weighed the completion of services against terminating her parental rights. *See In re E.A.F.*, 424 S.W.3d 742, 752 (Tex. App.—Houston [14th Dist.] 2014, pet. denied) (considering the failure to participate in services required for reunification in reviewing the best-interest determination). But Dominguez testified that he believed that neither Mother nor Father had benefited from the services they had completed. He explained,

> The McDonald's visit where the police were involved is a good example where [Father] chose to confront me about his case and speak about the case in front of his child. He did not have an issue with showing anger in front of the children, especially while holding one so close to him. And [Mother] also did not have an issue with [Father] doing that and decided not to take action and shield the children from that aggression and anger.

Dominguez testified that he had no concerns with Kevin's foster placement and that the foster home had provided Kevin with appropriate medical care when he was sick or when he suffered from allergies. Dominguez acknowledged that Kevin received bruises while in foster care but stated that those bruises likely arose from Kevin "[j]ust being a kid." Like Dominguez, Kovich testified that she had no concerns about the foster placement. The foster family that Kevin lived with at the time of trial wanted to adopt him and Braxton. Kovich testified about a

23

"marked" difference in Kevin's behavior from when she observed him in the foster home and during visits. She explained,

> [Kevin] is . . . energetic. He runs around. He's a typical toddler. He plays, he dances, he sings, he talks. He has a vocabulary that is out of this world. Foster mom is a retired school teacher and daycare owner, so he's in . . . a room that's dedicated to school stuff. So he's typical. He grabs me by the hand and he runs around and he shows me things. And in the visits, he stays on the blanket and watches Power Rangers.
>
> . . . .
>
> . . . [In the visits he] asks to play continually, and he's always told, in a minute, Bud, in a minute. And he has to stay there longer and longer. He does eventually get to play a little bit, and it will last, I don't know, 15 minutes or so.

Based on these facts, the jury could have reasonably found that terminating Mother's parental rights and allowing his adoption would provide a level of permanence, care, and stability that Mother was unable to provide. *See Holley*, 544 S.W.2d at 371–72.

Finally, Kevin's attorney ad litem supported the termination of Mother's parental rights, and Kovich, his guardian ad litem, likewise supported termination. *Cf. In re G.H.*, No. 02-17-00193-CV, 2017 WL 4683925, at *9 (Tex. App.—Fort Worth Oct. 19, 2017, no pet.) (mem. op.) (considering an attorney ad litem's recommendation in a best-interest review).

After considering this evidence and the remaining facts revealed by the record, we conclude that the jury could have formed a firm belief or conviction that termination of Mother's parental rights to Kevin was in his best interest; thus,

24

we hold that the evidence is factually sufficient to meet the best-interest requirement under section 161.001(b)(2). *See* Tex. Fam. Code Ann. § 161.001(b)(2); *C.H.*, 89 S.W.3d at 28. We overrule Mother's fourth issue.

**Father's Appeal: The Appeal is Frivolous**

In Father's appeal, his appointed appellate counsel has filed a motion to withdraw and brief in support of that motion in which he asserts that Father's appeal is frivolous. *See Anders*, 386 U.S. at 744–45, 87 S. Ct. at 1400; *see also In re K.M.,* 98 S.W.3d 774, 776–77 (Tex. App.—Fort Worth 2003, no pet.) (holding that *Anders* procedures apply in parental termination appeals). The brief meets the requirements of *Anders* by presenting a professional evaluation of the record and by demonstrating why there are no arguable grounds for appeal. Father did not file a response to the *Anders* brief.

Once an appellant's court-appointed attorney files a motion to withdraw on the ground that the appeal is frivolous and fulfills the requirements of *Anders*, we must independently examine the record to determine if any arguable grounds for appeal exist. *See Stafford v. State*, 813 S.W.2d 503, 511 (Tex. Crim. App. 1991); *Mays v. State*, 904 S.W.2d 920, 922–23 (Tex. App.—Fort Worth 1995, no pet.); *see also In re P.M.*, 520 S.W.3d 24, 27 & nn.9–10 (Tex. 2016) (order), *cert. denied*, 138 S. Ct. 1562 (2018). When analyzing whether any grounds for appeal exist, we consider the record, the *Anders* brief, and any pro se response. *In re Schulman*, 252 S.W.3d 403, 408–09 (Tex. Crim. App. 2008) (orig. proceeding).

We have carefully reviewed counsel's brief and the entire appellate record. We agree with counsel that Father's appeal is frivolous. *See Bledsoe v. State*, 178 S.W.3d 824, 827 (Tex. Crim. App. 2005). Because counsel does not show good cause for withdrawal independent from his conclusion that the appeal is frivolous, we deny the motion to withdraw. *See P.M.*, 520 S.W.3d at 28; *In re C.J.*, 501 S.W.3d 254, 255 (Tex. App.—Fort Worth 2016, pets. denied).

## Conclusion

Having overruled Mother's dispositive issues and having agreed with Father's counsel that Father's appeal is frivolous, we affirm the trial court's judgment terminating Mother's and Father's parental rights to Kevin.

/s/ Wade Birdwell
WADE BIRDWELL
JUSTICE

PANEL: WALKER, MEIER, and BIRDWELL, JJ.

DELIVERED: July 5, 2018